**Fred Rose MORALES, Appellant,**

v.

**UNITED STATES of America,
Appellee.**

**No. 19441.**

United States Court of Appeals
Ninth Circuit.

May 1, 1965.

H. Hal Visick, Los Angeles, Cal., for appellant.

Francis C. Whelan, U. S. Atty., Richard A. Murphy, Asst. U. S. Atty., Chief, Crim. Sec., Robt. H. Filsinger, Asst., U. S. Atty., Los Angeles, Cal., for appellee.

Before BARNES, DUNIWAY and ELY, Circuit Judges.

ELY, Circuit Judge:

Fred Rose Morales was charged, in three counts, with concealment and facilitation of concealment of certain quantities of heroin in violation of Section 174, Title 21 United States Code. In a

jury trial, Morales was found guilty of the charges preferred in the three separate counts, and this appeal is from the judgment of conviction.

Morales and his wife, Patricia, resided in a dwelling located in Whittier, Los Angeles County, California, and it was in that dwelling that Morales was arrested. Prior to his arrest, the office of the Sheriff of Orange County, California, had, for some time, been in possession of two valid warrants calling for the arrest of Patricia. One of the warrants had been issued because of her failure to report to the California Youth Authority and the other because of her failure, after she had been released on her own recognizance, to make a timely appearance for answer to a charge of violating Section 11721 of California's Health and Safety Code. See Footnote #1, infra.

The arrest of Morales occurred at approximately 10 p. m. on February 6, 1964. Four days before, a Sergeant of the Orange County Sheriff's Department had been informed as to the residence of Patricia in the Whittier house. The Sergeant contacted the Sheriff's office of Los Angeles County and arranged to meet with officers from that office and arrest Patricia. At approximately 8:00 or 8:30 p. m. on the night of the arrest, the Orange County Sergeant, with an investigator, had, from the outside of the Whittier dwelling, observed Patricia on the inside but did not, at that time, attempt to take her into custody. At 10 o'clock p. m., an hour and one-half or two hours later, the Sergeant returned to the Whittier house with four officers, two of whom were stationed at the rear of the house to prevent escape, and, in company with two of the officers, entered the house without the consent of the occupants and arrested Patricia upon the warrants. At the time of her arrest, Patricia was in the living room of the home with her husband and a number of relatives who were being entertained.

Morales was known to have been a user of narcotics and, in the past, to have offended the law in respect to illicit drugs. Immediately after the arrest of Patricia, one of the entering officers approached Morales and asked him whether or not he was then using narcotics. Morales replied that he was "dirty," a description which characterized him, in the vernacular commonly employed by drug addicts, as one using narcotics at the time. At the request of one of the officers, Morales displayed his arms, and on both of them appeared recent puncture wounds which, according to the testimony of one of the experienced officers, evidenced recent injection of narcotics. It was also noted, by at least one of the officers, that the movements of Morales were slow and that his eyes were constricted. From this, the officers concluded that Morales was "slightly" under the influence of narcotics, and he was placed under arrest for violation of Section 11721 of California's Health and Safety Code.[1]

Patricia had expressed unwillingness to converse with the arresting officers in the presence of her relatives and requested two of the officers to accompany her into the bedroom. There, with the bedroom door closed, she admitted that she, too, was using narcotics and displayed her arms marked with punctures. Upon inquiry, Patricia denied the presence of narcotics in the house and told the officers that they might conduct a search. Immediately the bedroom and adjoining closet were searched, and in a man's coat, packages of heroin, together with narcotics paraphernalia, were discovered. Morales was then brought into the bedroom and, upon being confronted with the packages, admitted their ownership while protesting that his wife was unaware of their existence.

1. "§ 11721. * * *
 "No person shall use, or be under the influence of narcotics, excepting when administered by or under the direction of a person licensed by the State to prescribe and administer narcotics. * * *"

Thereafter, Morales was held in the custody of State officers until around noon of the following day, at which time he was transferred to the custody of Federal authorities. From approximately 1:30 or 2:00 p. m. on February 7, 1964, until approximately 3 p. m. on the same day, Morales was interviewed by Federal narcotics agents in an office located in the Federal Building in Los Angeles. During the interview, the Federal agents questioned Morales concerning the confiscated packages of heroin and told Morales that "any cooperation he gave the Government would be reported to the United States Attorney's office." Morales then admitted, according to the testimony given by one of the interviewing Federal officers during the trial, that he had purchased the narcotic in Mexico and transported it into the United States.

Morales has been ably defended by court appointed counsel, both here and in the Court below. It has been insisted, first in a motion to suppress evidence, second by timely objection, and third in contentions made here, that Morales was illegally arrested and that his home was illegally searched. We must reject these contentions. The officers entered the house armed with valid warrants directing them to apprehend one of the joint permanent residents of the dwelling. Once they were lawfully inside, Morales freely advised them, upon inquiry being made, that he was then using narcotics. Moreover, his physical appearance furnished evidence of the use, and he voluntarily exposed his puncture-marked arms for examination. It then became the right, as well as the duty, of the officers to arrest him for violation of Section 11721, California Health and Safety Code.[2] He was, according to his uncoerced admission and his appearance, under the influence of narcotics in the presence of the officers. No warrant is required for the arrest by California officers of one whose arrest is made during his violation of the law in the presence of the arresting officers. Section 836, California Penal Code. Coverstone v. Davies, 38 Cal.2d 315, 239 P.2d 876 (1952), People v. Russell, 196 Cal.App.2d 58, 16 Cal.Rptr. 228 (1961). See also, Rodgers v. United States, 267 F.2d 79, 85 (9th Cir. 1959).

Morales contends that entrance to his home was illegally gained through sham. He claims that the avenue of legal entry which was furnished by warrants running to Patricia was actually taken for the purpose of arresting him. He urges that we should reason that if Patricia were the person whose arrest were really sought, she would have been arrested when observed by the two officers an hour and one-half or two hours before the entry into the home was made. He urges, further, that it was unneces-

---

2. Appellant contends that Section 11721 is unconstitutional and that hence, his arrest was unlawful. Formerly, the statute read in part: "No person shall use, or be under the influence of, *or be addicted to the use of narcotics,* * * *" (Emphasis ours) The italicized language was deleted following the decision by the Supreme Court of the United States that this "individual provision" of the statute was violative of the Fourteenth Amendment of the Federal Constitution. Robinson v. People of State of California, 1962, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed. 2d 758, rehear. den., 371 U.S. 905, 83 S. Ct. 202, 9 L.Ed.2d 166. The Supreme Court recognized that narcotics addiction is a disease. Here, the appellant urges, in effect, that his being "under the influence of narcotics" at the time of his arrest resulted from irresistible compulsion induced by the disease of narcotics addiction and that consequently, the same reasoning which was applied by the majority in Robinson should compel the present determination that, as applied to appellant, the amendment, by deletion, of the California statute has not saved its constitutionality. Under certain circumstances, the contention would be worthy of serious consideration, as indicated by Mr. Justice White, dissenting, when he wrote of the majority opinion in Robinson, "Beyond this it has cast serious doubt upon the power of any State to forbid the use of narcotics under threat of criminal punishment." In the record of this case, however, there is no clear evidence that appellant was addicted to the compulsive use of narcotics; consequently, there is no adequate supporting premise for his argument.

sary to employ the combined force of five officers to arrest the twenty year old Patricia and that the whole circumstances disclose, not a legitimate aim to arrest Patricia, but on the contrary, an illegal scheme to search for evidence which would incriminate him when there existed no evidence which would justify the issuance of a warrant for such search.

These contentions, while imaginative, have no substantial merit. It would be unique and improper for this court to concern itself with the precise timing of arresting action taken under warrant. The record does not disclose that the officers had any knowledge whatsoever of the temperaments, dispositions, or characters of those who, other than the permanent occupants, were present in the home at the time the entry was made. It would be grave, indeed, for this court, or any court, to make a pronouncement which might influence police officers further to imperil themselves in their hazardous duty by reducing the number of participants in an arresting party obliged to move into the company of two persons thought to have used narcotics in the past and other adult persons who might possibly offer resistance and even violence.

 The receiving into evidence of the admissions made by Morales immediately before and after his arrest is challenged upon the assertion that since Morales was under the influence of narcotics, it necessarily follows that his faculties were impaired to an extent such as to compel a conclusion that the admissions were made involuntarily. The record does not support the factual premise upon which the point is based. While there was evidence, as stated above, that Morales appeared to be "slightly under the influence of narcotics," there was also evidence that during the time of the conversations at the place of arrest, the speech of Morales was not impaired and that he answered questions in such a manner as to negate the then existence of drug induced mental disability. In this state of the record, there is no justification for disturbing the determination of the trial judge as to the propriety of receiving the incriminating admissions into evidence. United States v. Page, 302 F.2d 81, 85 (9th Cir. 1962), Chessman v. People, 205 F.2d 128, 129 (9th Cir. 1953), cert. den., 1953, 346 U.S. 916, 74 S.Ct. 278, 98 L.Ed. 412, rehear. den., 1954, 347 U.S. 908, 74 S.Ct. 430, 98 L.Ed. 1066.

 It is urged that, assuming the lawful arrest of Morales, the officers, in searching the bedroom and adjoining closet, unconstitutionally extended the scope of the search beyond permissible limits. We do not agree. The Fourth Amendment of the Constitution prohibits "unreasonable searches and seizures", but, as was said in Go-Bart Importing Co. v. United States, 1931, 282 U.S. 344, at 357, 51 S.Ct. 153, at 158, 75 L.Ed. 374, at 382, "There is no formula for the determination of reasonableness. Each case is to be decided on its own facts and circumstances." In a later opinion, the Supreme Court said, "The relevant test is not whether it is reasonable to procure a search warrant, but whether the search was reasonable. That criterion in turn depends on the facts and circumstances— the total atmosphere of the case. * * * What is a reasonable search is not to be determined by any fixed formula. The Constitution does not define what are 'unreasonable' searches and, regrettably, in our discipline we have no ready litmus paper test. The recurring questions of the reasonableness of searches must find resolution in the facts and circumstances of each case." United States v. Rabinowitz, 1950, 339 U.S. 56, at 66, 63, 70 S. Ct. 430, at 435, 434, 94 L.Ed. 653, at 660, 658. It is recognized that "Search and seizure incidental to a lawful arrest is a practice of ancient origin and has long been an integral part of the law enforcement procedures of the United States. * * *" Harris v. United States, 1947, 331 U.S. 145, at 150, 67 S. Ct. 1098, at 1101, 91 L.Ed. 1399, at 1405, rehear. den., 1947, 331 U.S. 867, 67 S.Ct. 1527, 91 L.Ed. 1871. Our own court has consistently held, as stated in Marron v. United States, 8 F.2d 251, at 254 (9th

Cir. 1925), aff'd. 1927, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231, rehear. den., 1928, 276 U.S. 590, 48 S.Ct. 206, 72 L.Ed. 1016, " * * * The right of search extends to the premises in control of the defendant arrested, and authorizes the seizure of that which is evidentiary of the crime." Fraker v. United States, 294 F.2d 859 (9th Cir. 1961), Burks v. United States, 287 F.2d 117 (9th Cir. 1961), cert. den., 1962, 369 U.S. 841, 82 S.Ct. 868, 7 L.Ed.2d 846, rehear. den., 1962, 369 U.S. 882, 82 S.Ct. 1143, 8 L.Ed.2d 284.

■ Applying the accepted standard of reasonableness here, we hold that it was entirely reasonable, under the circumstances, for the officers, having been invited by Patricia to do so, to search the immediately adjacent area to the room in which Morales was arrested. Their search of the bedroom and closet was especially reasonable because of the presence of visiting relatives in the living room where Morales was arrested and where it would be unlikely that the heroin and narcotics paraphernalia would be close at hand for possible discovery by the visitors.

We must reject the contention of Morales that he was unconstitutionally deprived of the benefit of counsel during the crucial stages of the investigative procedure. He relies upon Escobedo v. State of Illinois, 1964, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977, but, in our view, the facts bear no such similarity to those in Escobedo as to call for the application of the rule.

■ The argument that the presumption required by the term embraced within the provisions of Section 174 of Title 21 U.S.C.[3] is unconstitutional has been consistently rejected. Yee Hem v. United States, 1925, 268 U.S. 178, 45 S.Ct. 470, 69 L.Ed. 904, Bradford v. United States, 271 F.2d 58 (9th Cir. 1959), Hunter v. United States, 1964, 339 F.2d 425 (9th Cir. 1964), Pool v. United States, 344 F.2d 944 (9th Cir. 1965), decided February, 1965. Morales relies upon Barrett v. United States, 322 F.2d 292 (5th Cir. 1963) wherein the Fifth Circuit held a similar statutory presumption, contained in Section 5601 of Title 26 U.S.C., to be unconstitutional. The Supreme Court has now reversed the decision of the Fifth Circuit in such respect. United States v. Gainey, 1965, 85 S.Ct. 754.

■ Finally, we meet a problem which must be resolved in favor of Morales. This problem arises from the trial court's denial of a timely motion to strike evidence given by a Federal narcotics agent as to the incriminating admissions made by Morales during the interrogation conducted by Federal narcotics agents from 1:30 or 2:00 p. m. to 3:00 p. m. on February 7, 1964. This interrogation was conducted on the fourth floor of the Federal Building in Los Angeles, the same building in which are located the office and hearing room of the United States Commissioner.[4] In the same building, there are also located the chambers and courtrooms of ten of the thirteen active United States District Judges for the Southern District of California. February 7, 1964 fell on a Friday which was not a legal holiday. The Government offered no explanation as to why Morales, having been surrendered by State officers to Federal officers at about the hour of noon, was not taken

---

3. "§ 174. * * *

"Whenever on trial for a violation of this section the defendant is shown to have or to have had possession of the narcotic drug, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains the possession to the satisfaction of the jury."

4. On February 7, 1964, Honorable Theodore Hocke was the United States Com-

missioner; however, on March 7, 1955, Honorable John A. Childress, Clerk of the United States District Court, was appointed United States Commissioner with the limited authority to perform the duties of Commissioner at times when Commissioner Hocke was absent. He was still so empowered as of February 7, 1964, and his office was located on the second floor of the Federal Building in Los Angeles.

before a United States Commissioner for arraignment and advice as to his constitutional rights until approximately three hours later.

Rule 5(a) of the Federal Rules of Criminal Procedure requires, in its pertinent language: "An officer making an arrest under a warrant issued upon a complaint or any person making an arrest without a warrant shall take the arrested person without unnecessary delay before the nearest available commissioner." Application of the requirement led the Supreme Court to hold, in a landmark decision, that confessions secured during a period of detention in violation of the rule would constitute inadmissible evidence. McNabb v. United States, 1943, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819, rehear. den., 1943, 319 U.S. 784, 63 S.Ct. 1322, 87 L.Ed. 1727. A conviction resting on disregard of the rule's required procedure could not, said the court, "be allowed to stand without making the courts themselves accomplices in wilful disobedience of law." Citing Mitchell v. United States, 1944, 322 U.S. 65, 64 S.Ct. 896, 88 L.Ed. 1140, rehear. den., 1944, 322 U.S. 770, 64 S.Ct. 1257, 88 L.Ed. 1595, the Supreme Court, in Upshaw v. United States, 1948, 335 U.S. 410, at 413, 69 S.Ct. 170, at 172, 93 L.Ed. 100, at 103, held " * * * a confession is inadmissible if made during illegal detention due to failure promptly to carry a prisoner before a committing magistrate, whether or not the 'confession is the result of torture, physical or psychological * * *.'" Especially controlling here is language from Mallory v. United States, 1957, 354 U.S. 449, at 454, 455, 77 S.Ct. 1356, at 1359, 1 L.Ed.2d 1479, at 1483, in which the Federal rule, as to required procedure following arrest, is defined as follows: "The next step in the proceeding is to arraign the arrested person before a judicial officer as quickly as possible so that he may be advised of his rights and so that the issue of probable cause may be promptly determined. The arrested person may, of course, be 'booked' by the police. But he is not to be taken to police headquarters in order to carry out a process of inquiry that lends itself, even if not so designed, to eliciting damaging statements to support the arrest and ultimately his guilt. * * *

"Circumstances may justify a brief delay between arrest and arraignment * * * But the delay must not be of a nature to give opportunity for the extraction of a confession." (Emphasis ours.)

The delay which is revealed in the present record cannot be denied to have been "of a nature to give opportunity for the extraction of a confession."

In Williams v. United States, 273 F.2d 781 (9th Cir. 1960) we held that there was no "unnecessary delay" in producing the prisoner before a Commissioner when the prisoner, following detention which was not unreasonable, did not reach the Federal Building until after the ordinary working hours of the Commissioner and necessarily could not be brought before the Commissioner until the following morning.

We said, in Muldrow v. United States, 281 F.2d 903, 905 (9th Cir. 1960), that the time of the prisoner's being held in custody by State officers " * * * should not be ignored entirely, nor can it be considered as federal custody. We think it should be taken into account in determining the reasonableness of the delay that did ensue after the federal officer took custody." In Muldrow, supra, at 906, quoting from Mallory v. United States, supra, we said, "[c]ircumstances may justify a brief delay * * *", and we repeated that which was suggested in Ginoza v. United States, 279 F.2d 616 (9th Cir. 1960), that there might properly be delay in presenting a prisoner for arraignment in order to attend to "such matters" as "(a) the 'booking' of a suspect, (b) 'quick verification through third parties' of a 'story volunteered by the accused,' (c) a search of the arrested person."

In Ginoza v. United States, supra, the prisoner was arrested between 3:15 and 3:30 p. m. and was immediately taken to the office of the District Supervisor of the Federal Bureau of Narcotics. He

arrived there betwen 3:30 and 3:45 p. m., and an interrogation immediately commenced. Approximately a half hour later, Ginoza made a damaging admission. Five minutes later, one of the interrogating officers telephoned the office of the United States Commissioner, whose office was located approximately five blocks away in distance and was told that the Commissioner had departed for his home. No immediate effort to reach the Commissioner at his home was made, and while two United States District Judges maintained their chambers in the Federal Building, the record did not indicate that an effort was made to ascertain their availability. The interrogation of Ginoza continued and additional damaging admissions were made until about 6:30 p. m. of the same day. On the next day, Ginoza was arraigned. We ruled that the trial court erred in denying Ginoza's motion to strike the testimony as to the admissions made during the time when Ginoza was illegally detained, as we held that he was, for not having been brought before a Commissioner without unnecessary delay.

In Muldrow v. United States, supra, there was a reasonable explanation why the prisoner could not be promptly taken before a Commissioner whose office was located eleven miles from the place where the prisoner was taken into custody by the Federal officers. We discussed Ginoza v. United States, supra, and said, in part, as follows: "After approximately an hour's questioning, Ginoza confessed. A call was made to the United States Commissioner, whose office was five blocks away, but he had gone home. No effort was made to contact the Commissioner at his home. No attempt was made to reach the two United States judges whose courts and chambers were in the federal building. There was another hour's questioning, and further damaging admissions by Ginoza." Muldrow v. United States, supra, at 906.

In the case at bar, as was not the case in Ginoza, Morales was interrogated in the same building wherein was located the office of the United States Commissioner. Not only was there "no attempt * * * made to reach the * * * United States judges whose courts and chambers were in the federal building," no attempt was made to reach the United States Commissioner until the time when Morales was arraigned. This followed his having been in custody, State and Federal, for seventeen hours, and his utterance, during Federal detention, of damaging admissions to Federal officers by whom he was previously told that if he would "cooperate", his "cooperation" would be brought to the attention of the United States Attorney's office.

Under the guiding principles announced by the Supreme Court and applied by our court in Ginoza v. United States, supra, we hold that on the facts in this case, all testimony given by the Federal officer concerning statements and admissions made by Morales after his surrender to the Federal authorities and before his being taken before a committing magistrate was inadmissible. Apart from these particular statements and admissions, there was ample evidence to support the conviction. Notwithstanding, the testimony was damaging to Morales, and he is entitled to a new trial.

Reversed and remanded.

BARNES, Circuit Judge (dissenting):

For the reason expressed in the Ginoza v. United States dissent (279 F.2d 616 (9th Cir. 1960)), I feel required to dissent, and do dissent, to this opinion, which follows the majority in Ginoza. An appellate court is not better qualified or more able to determine what constitutes "without unnecessary delay" (Rule 5(a))—which "cannot mean instantly" (Muldrow v. United States, 281 F.2d 903 (9th Cir. 1960))—than is the court below.